**TEXAS DEPARTMENT OF CRIMINAL JUSTICE, Appellant**

v.

**Terry L. TERRELL, Appellee.**

**No. 12–93–00297–CV.**

Court of Appeals of Texas,
Tyler.

Dec. 29, 1995.

Rehearing Overruled Feb. 8, 1996.

Louis Carrillo and Adrian L. Young, Austin, for appellant.

Robert J. Thomas, Austin, for appellee.

HADDEN, Justice.

This is an appeal from a judgment in a whistleblower case. Terry L. Terrell ("Terrell") sued the Texas Department of Criminal Justice ("TDCJ"), his former employer, alleging that TDCJ violated the Texas Whistleblower Act (the "Act")[1] by terminating him for reporting violations of law in good faith. The trial court rendered judgment on a jury verdict, awarding Terrell $452,808.00 in actual damages, $250,000.00 in punitive damages, court costs, attorney's fees, and pre- and post-judgment interest. In its six points of error, the TDCJ challenges the legal and factual sufficiency of the evidence, the purported waiver of sovereign immunity, the award of "out-of-pocket expenses", pre- and post-judgment interest, and the admissibility of certain evidence concerning American Correctional Association policy. We reverse and remand.

We will first address point of error four dealing with waiver of sovereign immunity, and then address the sufficiency arguments raised in points one and two. Because of our holdings in points one and two, it will not be necessary to address the remainder of the TDCJ points.

Pertinent sections of the Act provide:

.　　.　　.　　.　　.

Sec. 2. A state or local governmental body may not suspend or terminate the employment of, or otherwise discriminate against, a public employee who reports a violation of law to an appropriate law enforcement authority if the employee report is made in good faith.

Sec. 3. (a) A public employee who alleges a violation of this Act may sue for injunctive relief, damages, or both.

(b) A public employee who sues under this section had the burden of proof, but it is a rebuttable presumption that the employee was suspended or terminated for

---

1. TEX.REV.CIV.STAT.ANN. art. 6252–16a (Vernon Supp.1990), recodified as TEX.GOV'T CODE ANN. §§ 554.001–.009 (Vernon Supp.1993).

reporting a violation of law if the employee is suspended or terminated not later than the 90th day after making a report in good faith.

. . . . .

Sec. 4. (a) A public employee who sues under this Act may recover:

(1) actual damages;

(2) exemplary damages;

(3) costs of court; and

(4) reasonable attorney's fees

. . . . .

Tex.Rev.Civ.Stat.Ann. art. 6252–16a (Vernon Supp.1990).

█ In its fourth point of error, TDCJ contends that the trial court erred in overruling its motion for summary judgment, which alleged the defense of sovereign immunity, and in entering judgment against TDCJ. Specifically, TDCJ argues that the rulings were improper because the Act itself does not waive the state's sovereign immunity from liability, and that, at most, the Act waives immunity from suit only. TDCJ maintains that, unless the waiver of both immunity from suit and immunity from liability has been stated in explicit and unambiguous terms, the courts should refuse to find waiver. *See Mount Pleasant Indep. Sch. Dist. v. Lindburg,* 766 S.W.2d 208, 211 (Tex. 1989); *Duhart v. State,* 610 S.W.2d 740, 742 (Tex.1980).

Terrell argues that the intention of the legislature in enacting a law should be construed from the law itself, and that the aim and object of construction should be to ascertain and enforce the legislative intent, not defeat, nullify, or thwart it. *City of Mason v. West Texas Util. Cos.,* 237 S.W.2d 273, 278 (Tex.1951). Terrell maintains that the language in a statute is presumed to be selected and used with care and, likewise, every word or phrase in a statute is presumed to be intentionally used with meaning and purpose. *Chastain v. Koonce,* 700 S.W.2d 579, 582 (Tex.1985). Terrell further argues that since the legislature chose to include damage pro-

visions within the scope of the Act, the plain meaning of such provision would be to allow not only suit against the State but also the waiver of liability as to damages.

A review of the Act itself reveals that it specifically authorizes suit against a governmental body, but contains no explicit language granting or waiving immunity from liability.[2] However, it is clear from the language of the statute that the legislature intended to provide a public employee with a cause of action in which he would be entitled to recover damages and other remedies against the State. *Knowlton v. Greenwood Indep. Sch. Dist.,* 957 F.2d 1172 (5th Cir. 1992); *Texas Dept. of Human Serv. v. Green,* 855 S.W.2d 136 (Tex.App.—Austin 1993, writ denied). Therefore, we conclude that the legislature intended to waive the governmental agency's immunity from suit as well as liability. Point four is overruled.

In its first and second points of error, TDCJ claims that the evidence was legally and factually insufficient to support the jury's findings that: (1) Terrell qualifies as a whistleblower, and (2) he was terminated for reporting a violation of law. Before addressing these sufficiency points, we will summarize the evidence as disclosed by the record.

*TDCJ–ID*

The Texas Department of Criminal Justice, Institutional Division ("TDCJ–ID") operates the prison system of the State of Texas. It is a para-military organization with 26,000 employees, which functions through a chain of command and operates forty-six separate prison units throughout the state. Wardens of each unit report to a Regional Director who, in turn, reports to a Deputy Director of Operations. These offices function under the Director of TDCJ–ID.

In 1986, Terrell became the warden of Beto I Unit, the largest prison unit of TDCJ–ID. His immediate supervisor was Northern Regional Director, Marshal Herklotz ("Herklotz"). Terrell and Herklotz knew each other

---

**2.** In 1995, the Legislature expressly waived sovereign immunity in an amendment to the Act. *See* Act of May 25, 1995, 74th Leg., R.S., Ch. 721, 1995 Tex.Gen.Laws 3812, 3813. However, this waiver language is not retroactive, and would not apply in the present case.

well, having begun their service with the state prison system about the same time in 1970. Herklotz's immediate supervisors were Wayne Scott, Deputy Director of Operations, and James Collins, the Director of TDCJ–ID. Collins reported to the Executive Director of TDCJ, James Lynaugh, and Lynaugh was directly responsible to the Texas Board of Criminal Justice, the members of which were appointed by the Governor of Texas, Ann Richards. Selden Hale, an Amarillo attorney, was serving as chairman of the Board at all times pertinent to this case.

To maximize the application of the skills and experience of its personnel, TDCJ–ID's policy was to use a team approach to the management of a unit. The management team at Beto I consisted of the warden, one or more assistant wardens, and a building major who was responsible for the security of the building. Because of the growth of the prison systems and the dictates under a federal court order in force at the time, assistant wardens and majors for each unit were selected by promotion boards made up of senior officials and staff.

### RELATIONSHIP BETWEEN TERRELL AND HERKLOTZ

Through the years, a personality conflict developed between Terrell and his supervisor, Herklotz. It reached the point where Beto I personnel became divided into two camps—the Terrell camp and the Herklotz camp. In 1989, George Flowers, a long-time friend of Herklotz, was assigned to work for Terrell as the major at Beto I. In 1990, Harry Kinker was assigned to be an assistant warden at Beto I. Terrell considered Kinker and Flowers to be a part of the Herklotz camp. This conflict between Terrell and Herklotz was being watched by Deputy Director Scott. Scott knew that, in the interest of the organization, someone would have to be transferred if the conflict and complaints did not stop.

### THE FLOWERS COMPLAINT

Soon after Kinker and Flowers were assigned to work with Terrell at Beto I, Terrell complained to Herklotz about their assignments. On October 23, 1990, Terrell brought formal charges against Flowers for gross negligence of duty for his failure to properly respond to prison intelligence information concerning an inmate stabbing incident. Terrell reported these charges to Herklotz on October 25, 1990.

In accordance with TDCJ–ID policy, Deputy Director Scott appointed a neutral officer to investigate the charges. The neutral hearing officer ultimately reduced the charges from gross negligence to substandard duty performance and placed Flowers on probation for one month. The officer's decision to reduce the charges was based upon the fact that intelligence information such as that received by Flowers was commonly received by prison officials, and did not necessarily warrant a response. He also noted that two other officials who received the information did not deem it necessary to respond, and were not charged. Terrell did not agree with this result.

### THE NOONAN COMPLAINT

Eric Noonan was the chief of classification[3] at Beto I and worked under the supervision of Terrell. On October 25, 1990, Noonan attended a Northern Region classification officers' meeting in Huntsville conducted by the new Staff Service Officer, Terry Warren. Herklotz saw Noonan at the meeting and asked him about his working relationships with inmates and other Beto I personnel. No names were mentioned.

On October 26, 1990, Terrell wrote to Deputy Director Scott complaining that Herklotz had verbally abused Noonan at the meeting. Though Terrell was not present, his perception of what happened is contained in the formal complaint, which reads as follows:

*Allegation* Mr. M.D. Herklotz made reference to the possibility of a unit transfer to Mr. Eric Noonan. This suggestion was made as a harassment technique in an attempt to influence Mr. Noonan against what was perceived by Mr. Herklotz as cooperation in an official investigation pur-

3. Each prison unit has a classification section which determines inmate assignments.

sued by Warden T.L. Terrell against Major G.B. Flowers.

***Immediate Action Requested*** Removal of Mr. M.D. Herklotz from administrative responsibilities pertaining to Beto One. Request that this removal be documented in written format to Mr. Herklotz's office with copy to Beto One Warden's office. That this allegation be referred to an investigative process apart from TDCJ–ID's Internal Affairs or other TDCJ employees.

The immediate reassignment of Major ·G.B. Flowers to a unit other than Beto One.

That a copy of this correspondence be immediately made available to each Board Member of TDCJ.

On October 30, 1990, Terrell again complained to Scott that "upon returning to the unit and as I approached the unit entrance, I met Mr. Herklotz at approximately 3:50 p.m. on the highway as he was leaving. As we passed each other, he clearly shook his finger at me in a chastising manner." Terrell made the following allegation and request:

***Allegation*** On October 29, I was the subject of harassment in the form of hand gestures and verbal suggestions of retaliation due to my participation in an official investigation.

***Specific Charge*** Harassing or retaliating against others for participating in an official investigation.

***Specific Requests*** Mr. M.D. Herklotz be immediately removed from his current position pending completion of investigation. This office receive confirmation of his removal.

Each member of the TDCJ board be privileged to these circumstances and subsequent charges.

The investigation be assigned to someone other than TDCJ Internal Affairs.

That I be provided legal counsel of my choice at the expense of TDCJ pending completion of this investigation.

In accordance with agency policy and procedure, Scott referred these complaints to the Internal Affairs Division ("IAD") of TDCJ which is responsible for internal investigations. The IAD reported directly to the TDCJ Executive Director, with copies of the reports forwarded to the Board. Jerry E. Jackson, Chief of Investigative Operations of IAD, conducted the investigation. Jackson found no evidence to support Terrell's allegations against Herklotz. Pertinent parts of Jackson's 80–page investigative notes contain the following comments, which form the basis of his findings:

11–1–90 10:00 a.m.—Interviewed Eric Noonan at Tucker General Store. (Taped interview) Did not know why Herklotz counseled him—was .not a witness to any portion of Maj. Flowers' investigation.

11–1–90 1:35 p.m.—Interviewed Warden Terrell at his office. Taped interview—no specific evidence to support his belief that Mr. Herklotz was harassing Mr. Noonan. . . .—alleged that meeting called by Terry Warren was at direction of Mr. Herklotz just to get Mr. Noonan to Regional Hq.

11–1–90 Interviewed Mr. Marshall Herklotz 3:00 p.m.—taped interview—denies he was harassing Mr. Noonan because of his possible involvement with Maj. Flowers' investigation—Stated he had information Noonan involved with inmate Henley—and because of an earlier problem with Noonan (fraudulent claim)—he was merely giving Noonan something to think about in case he was getting involved with Henley.

11–1–90 Interview Terry Warren (taped conversation)—denied Mr. Herklotz set up unit classification meeting—states Mr. Herklotz not aware of meeting.

. . . . .

11–1–90 Brief Mr. Scott—no evidence to support allegation.

During Jackson's investigation of the "finger-pointing incident", Herklotz acknowledged that he had met Terrell on the road as Terrell was returning from Huntsville. Herklotz related that he frequently waived to people he meets while driving, and that he probably acknowledged Terrell by waiving his hand or finger. He denied that he was attempting to intimidate Terrell with his hands. Herklotz also related to Jackson his

perception as to why Terrell made these complaints:

> Based upon some feelings that they have in regards to some personnel changes or Mr. Terrell has in some personnel appointments to his unit. He voiced a great deal of displeasure when I moved Mr. Flowers ... Major Flowers from the Michael Unit to the Beto I Unit to the point that he said he didn't want him other there. He had indicated that Mr. Flowers was a snitch to me. Once again, when Mr. Kinker was promoted to Asst. Warden in this Unit, he even, if I'm not mistaken, he wrote a letter requesting that he be removed from this Unit immediately. I think not being involved in these personnel changes on this Institution which I can assure Mr. Terrell that those changes are going to continue to occur in the Northern Region and every other region of the system and he is not going to be involved in them at that level either.

Jackson found no evidence to support Terrell's allegations against Herklotz. After these investigations, Deputy Director Scott visited the Beto I Unit and obtained a commitment from all parties involved, including Terrell and Herklotz, to try to work together. According to Scott, things got better for a while, but matters began to deteriorate shortly thereafter.

### THE CLAY COMPLAINT

On April 2, 1991, Collins, Scott and Herklotz conducted a tour of the four Anderson County Units, which included Beto I. They found Beto I to be dirty, and ordered a sanitation audit for all four units. During the tour, Herklotz saw Terrell in the hallway and told him that another officer, Lowell Clay, would soon be transferred to the Beto I Unit. Herklotz explained that Clay, formerly a lieutenant, had been involved in an insubordinate verbal altercation with the building major and the warden at the Hughes Unit. As a result, he was demoted to Corrections Officer III, and transferred to the Palestine area. Herklotz told Terrell that Clay was not one of his favorite employees because of this problem, and that he did not want him to receive any special favors.

Contrary to Herklotz's request, Clay was given a "choice assignment" in Beto I by the major's office. This decision was approved by Terrell. On April 4, 1991 around 5:30 p.m., a staff member informed Herklotz of the assignment. Herklotz immediately called Terrell and reminded him of their previous conversation about Clay's work assignments. According to Terrell, the conversation was as follows:

HERKLOTZ: I thought you would take care of it. Can you move him to another job?

TERRELL: I would rather not.

HERKLOTZ: Then I'll just transfer him.

TERRELL: Fine ... transfer him.

HERKLOTZ: By the way, I just wanted to let you know that your building was the dirtiest we toured the other day.

TERRELL: Well ... who's the Building Major?

HERKLOTZ: Why don't you tighten his ass up?

TERRELL: I don't have any authority over him.

HERKLOTZ: That's a lie, I told you he worked for you. Be in my office at 7:30 a.m. ... partner.

Even before this conversation with Herklotz, Terrell knew that physical and sanitary/safety inspections were planned for the units because he had received a telex from W.B. Warren, Assistant Northern Regional Director, notifying all northern region wardens about the impending inspections.

At their 7:30 a.m. meeting on April 5, 1991, Herklotz told Terrell that he was concerned about Terrell's statement that "he did not have authority over the building major." Because of this statement, he was going to request that the scope of the already planned audit be expanded into a baseline audit covering all aspects of the unit. He explained that after the audit, they would set milestones and dates for accomplishing the audit recommendations. Terrell agreed to this.

Herklotz and Terrell also discussed Flowers at this meeting. Herklotz said that he was considering having Flowers transferred from Beto I. Terrell requested that he be allowed to participate in the selection of

Flowers' replacement. Herklotz reminded Terrell that, according to policy, the decision would be made by the Regional Office. However, Herklotz invited Terrell to call in his recommendations, and stated that they would be considered.

Clay's assignment was also discussed, and they agreed that he would not be transferred. Herklotz assured Terrell several times that Terrell had the authority to assign Clay and the other employees at Beto I to whatever jobs were needed to accomplish the goals of TDCJ. The tenor of the meeting was that Herklotz supported Terrell in his efforts to manage Beto I.

Notwithstanding the apparent cooperative meeting on April 5th, Terrell sent an interoffice communication to Scott three days later complaining that he was again being harassed by Herklotz. Terrell stated that Herklotz ordered the audit of his unit as a harassment technique for not responding to his requests regarding Clay's assignment. The complaint reads as follows:

On April 04, 1991, I received a call at my residence which has led to my becoming the victim of harassment by Mr. M.D. Herklotz. (see attachment) The harassment has taken the form of a planned special audit of the entire Beto One Unit operation. While the audit is not opposed, the reasons for the pursuit of this audit are clearly the result of my refusal to harass Mr. Clay at the request of Mr. Herklotz. As a result of this incident, the following request is submitted.

* Mr. Herklotz be immediately removed from administrative responsibilities as the Northern Regional Director.

* That a full and complete copy of these allegations be provided to the Board of Criminal Justice.

* That a complete investigation of these allegations be accomplished by a source completely separate from the influence of this agency and apart from the existing operations of Internal Affairs.

* That I be provided with legal assistance of my preference to avoid further harassment.

Please note that this is the second set of allegations presented of recent months by this office.

Again Scott referred the complaint to the IAD, and Joe S. Fernald of that division conducted an investigation of the complaint. His 300 page investigative report, dated April 22, 1991, concluded that Terrell's allegations "cannot be substantiated."

Scott temporarily postponed the audit of Beto I to be sure that there was no connection between Terrell's complaints and the ordering of the audit. He also wanted to be sure that Terrell was treated fairly. When Terrell's allegations were "nonsustained," Scott and his superiors proceeded with the audit. Among the significant conclusions of the audit team was low employee morale and lack of leadership at Beto I.

Scott sensed Terrell's frustration, and spoke with him privately in his office. He told Terrell that he intended for the staff of Beto I to be answerable to Terrell, and that some personnel changes would probably be made. He also instructed Terrell to be patient and remain as professional in his duties as he possibly could. Scott confidentially mentioned a possible transfer for both Terrell and Herklotz in order to correct the problem at Beto I.

### APPEALS TO CHAIRMAN HALE, GOVERNOR RICHARDS, ET AL.

Terrell disagreed with the results of the above investigations, and wrote a letter on May 13, 1991, to Selden Hale, Chairman of the Board of TDCJ. He also sent copies of the letter to several other State officials. The letter is quoted as follows:

Dear Chairman Hale,

Please review the following circumstances, which make necessary a direct request to your office. Recent incidents have occurred within this agency, which have left this office in a vulnerable position without recourse.

#### Statement of Issue

Agency response to complaints generated by this office are illegitimately, irresponsi-

ble, and deserving of a complete investigation directed by the Texas Board of Criminal Justice.

### Circumstances of Issue

1. November 89—Disciplinary process against Captain Billy Hyman was interrupted by Agency officials. Halt to in-progress action against said employee was initiated by Director James Lynaugh at the request of then Chairman, Charles Terrell. Investigation of allegations presented by Captain Hyman was pursued in a deceptive manner. This office was denied access to responding report. Specific allegations, investigative reports, and finding conclusions were hidden from this office. Complaints of such were subsequently ignored.

2. October 90—Complaints of misconduct pertaining to Mr. M.D. Herklotz were contemptibly "not-sustained." This finding was promptly accomplished while providing no written response to this office of reported conclusions. These findings are contrary to the facts pertaining to said events and were obviously closed in that regard, while bending to influence.

*These investigative results are indicative of the contaminated resources found in the operation of Internal Affairs.*

3. April 91—Most recent allegations against Mr. M.D. Herklotz have been approached in a manner that would cloud the facts.

The facts are:

* Mr. Herklotz undeniably made reference to Mr. Lowell Clay as not being a "favored employee" and it was suggested that he receive a poor job assignment.

* A phone call was placed by Mr. M.D. Herklotz to my residence complaining of my refusal to assign Mr. Lowell Clay to a position satisfactory to the personal preference of Mr. Herklotz.

* An impromptu meeting was immediately scheduled for 7:30 a.m. the following morning. Meeting concluded with the retaliatory pursuit of an audit of Beto One.

Conclusatory statement reports pertaining to these investigations are not shared with this office. Requested access to said information has been denied.

### Basic Claims

The administrative action of this department is corrupt to the following extent:

1. Illegitimate investigative approach by Internal Affairs to include illegitimate action/inaction by Mr. Jim Gant, Mr. Joe Fernal, Mr. Jerry Jackson, and Mr. Bobby Warren.

2. Illegitimate administrative action/inaction demonstrated by Mr. James Lynaugh, Mr. James Collins, and Mr. Marshall Herklotz.

### Official Action Requested

1. That a complete investigation of these circumstances be accomplished by a source with legitimate purpose.

2. That legal service of my choosing be provided for my office through agency funds for the duration of this investigative process.

3. That all previous Internal Affairs investigative reports concerning these issues be made available to this office.

Sincerely,

T.L. Terrell
Senior Warden
Beto One Unit

TLT/dp

cc: Governor Ann Richards
Jashua W. Allen, Sr.
James M. Eller
Ben Gallant
Ellen J. Halbert
Jerry H. Hodge
Allan B. Polunsky
Mamie Moore Proctor
F.L. Stephens
Attorney General Dan Morales file

As a former Marine and a trial lawyer with twenty-five years' experience, Hale recognized that Terrell's departure from the chain of command presented problems. However, since it was obvious that Terrell was upset

and distraught, Hale arranged a meeting with Terrell on May 16, 1991, at the TDCJ headquarters in Austin. From the tenor of the letter, Hale believed that Terrell was probably planning a whistleblower lawsuit; consequently, Hale had a third party attend the meeting and take notes.

The notes of the meeting reflected Terrell's general complaints, which were that Herklotz had abused his office by: (1) promoting loyalty, regardless of talent, (2) transferring incompetent people to Beto I, and (3) making transfers because of friendship or sexual favors. Terrell had no evidence of the alleged sexual favors—he said it was just general gossip. Terrell complained that his grievances about these matters went unheeded. He told Hale that he filed a grievance asking that wardens be included within the approval process regarding unit assignments, but with no results. Without going through proper channels, Terrell also wrote the Attorney General of Texas for a legal opinion on this issue, but received no response. Terrell stated that he had been told informally that no one appreciated his actions, and that Herklotz had insinuated that Terrell was alienating himself from the rest of the staff and employees. Terrell acknowledged, however, that he had never been cursed, abused, or reprimanded for this.

Terrell also told Hale about the circumstances surrounding the Flowers, Noonan, and Clay incidents. He complained that no one contacted him during the investigations in those matters. He also complained that he was not given copies of the investigations prepared by IAD. Hale pointed out to Terrell that this was TDCJ policy and that IAD was responsible to the Board. Terrell stated that he was not happy with the findings by IAD, and he felt that the finding of "non-sustaining" was contemptible. When Hale asked Terrell if he believed Lynaugh, Collins, Herklotz, Warren, Gant, Fernald, and Jackson were corrupt, Terrell stated yes. Terrell said that Collins was a "liar," "a very good liar," and "a bad administrator." Terrell stated that Scott was the only one that was not participating in corrupt behavior, but that everyone else above him was corrupt. Hale asked Terrell how he could continue to work for such a corrupt organization, and Terrell told him that that was why he wanted to meet with Hale—he didn't think he could continue to work with the department unless things changed.

After the meeting, Hale conducted a briefing with TDCJ Executive Director Lynaugh, other officials in IAD, and members of the department. Hale's impression was that Terrell was paranoid, and had no evidence to support his complaints. Hale believed that Terrell was sick and that his actions were an attempt to further his personal disagreements with Herklotz and others. The following exchange between Hale and Terrell's attorney during deposition appropriately expresses Hale's impression:

Q: Have you—do you have any type of experience or any type of education in psychology?

A: Yeah.

Q: What is your background in psychology?

A: Well, of course, I studied it some in college. You know, I've been practicing law for 25 years. I've talked to every nut in Amarillo and the Texas Panhandle. I've represented half of them. My little brother is a Ph.D. out at the med school. My family has nurses. And, you know, I have better than an average man's view of what crazy people are. And I—you know, I just thought—

Q: Let me stop you there, please. So it was your opinion on May 15th or May 16th of last year that Warden Terrell was crazy?

A: No, I didn't say that.

Q: You said that he had psychological problems?

A: That's right. I thought that—do you understand the phrase "paranoia"?

Q: Yes, sir.

A: That's where you think everybody's against you. Well, I thought that the idea that a warden had worked in this agency for 20 years or 15 years, or however long he had worked, and everybody that he worked with was against him, was corrupt, was no good, was out to get him, was paranoia.

. . . . .

Q: Okay, sir. Let me start over again and see if we can build a predicate from what happened. After Warden Terrell left the meeting in Austin, what did you do?

A: I walked out and I told Mr. Lynaugh and Mr. Collins generally what the tenor of the conversation was. I went over my notes with them. And then I had Ms. Flowers—or Ms. Powers type those notes up. I recall—I believe, and I don't exactly—I can't recall how I know this, but I believe that she made copies of the notes for the line officers, the staff officers, Mr. Collins, Lynaugh, and probably Mr. Scott. But I was so incredulous about the warden's behavior, that I suggested to Mr. Lynaugh that he was—he had some emotional problems. And so that's when I think they had him looked at by a psychiatrist or a psychologist.

Q: Are you telling us today that it was your recommendation to Mr. Lynaugh that Warden Terrell be—have—undergo a psychological examination?

A: No. All I told Mr. Lynol (sic) was that I thought the warden was—had some problems, that he was paranoid, that he saw conspiracies, he saw plots, everybody was out to get him. And I—and I remember telling Mr. Lynaugh that, you know, I've seen sick people all my life and I thought he had some real problems. And as I recall, Mr. Lynaugh didn't say anything, except he listened to me, and then I think later on, it's my understanding that he asked Warden Terrell to talk to a psychologist.

Director Lynaugh's response to Hale was that he was going to let Terrell have some time off. Then the next day, May 17, 1991, Terrell wrote the following letter to Governor Ann Richards:

Dear Governor Richards,

Please allow a brief introduction to existing issues and circumstances of primary concern to this office. I am currently the Warden of the Beto I unit which falls within the Texas Department of Criminal Justice—Institutional Division. Recent complaints have been submitted by this office giving description to circumstance that I believe accurately reflects the over-

all unprincipled operation of this agency. These allegations include strong implications of extensive administrative corruption throughout the agency, to include the agency *Internal Affairs* department.

Recently, during a meeting scheduled for my attendance, these allegations were addressed in conversation with Mr. Selden Hale, III, Board Chairman TDCJ. While I anticipated a high degree of resentment and resistance from in-house agency personnel, the approach taken my Mr. Hale was surprisingly similar to those who are named as the subject of said claims. The posture assumed by Mr. Hale was one of arrogant disregard for any need of fundamental fairness and seemed to quickly discount the integrity of my complaint.

My request at this point would be that your office might provide intervention as you deem necessary. Any assistance offered at this time would be greatly appreciated.

Sincerely,

T.L. Terrell

Governor Richards nor anyone in her behalf made a response to the letter.

### MENTAL EVALUATION OF TERRELL

On May 29, 1991, Lynaugh and Scott met with Terrell. Lynaugh felt that Terrell was under a great deal of stress, and asked him to voluntarily submit to a mental evaluation. Terrell agreed. Terrell was given three weeks' leave time during which he was examined by a psychiatrist, Dr. Richard Coons, and a psychologist, Dr. George Parker, both of whom were in private practice in Austin, Texas. Neither was connected with the TDCJ.

Dr. Parker's findings and conclusions can be summarized by the following excerpt from his report:

*Findings from Interview:*

... Heretofore, Warden Terrell has consistently provided excellent service to the state, and his vocational role has brought him welcome challenge and fulfillment. More recently, however, his work experience has generated considerable frustration, stress, and dissatisfaction because of

his perceived inability to adequately fulfil his professional responsibilities and duties. Warden Terrell attributes these problems to increasing interference with his performance of his duties caused by recent organizational changes and growing administrative conflicts. Furthermore, over the past few years, Warden Terrell senses that colleagues have interfered with his good-intentioned efforts to alleviate problems. Consequently, he has been feeling further frustrated and distressed, and seems to be feeling increasingly alienated from his colleagues.

*Findings from Psychometrics:*

The validity measures in the psychometric data indicate that Mr. Terrell was adequately forthcoming in his responses to the tests, making the results an accurate indication of his present personality functioning. These data reflect that Mr. Terrell is feeling dissatisfied with his present life circumstances, and is experiencing feelings of somewhat diminished self-confidence. He has tended to externalize the blame for some of his problems (as he did during interviews), and that locus may be an accurate perception, rather than merely an attempt to shirk responsibility. The data indicate that Mr. Terrell may at times be overly sensitive to criticism, and that tendency may contribute to lowered morale under stress.

In responding to the psychometrics, Mr. Terrell has denied significant psychopathology, other than mild depression, which is likely situational and stress-related. There is nothing in the psychometrics that would indicate that Mr. Terrell may have a significant mental or characterological problem that might interfere with his usual performance of his warden duties.

. . . . .

*Conclusions:*

It is my best professional opinion that there is nothing in my examination of Warden Terrell that would indicate that he has a diagnoseable mental disorder that would interfere with his fitness to perform successfully the duties of warden of a major prison complex. I believe that his current work-related problems are primarily con-

textual in nature. It is my impression that these work-related problems have recently caused Mr. Terrell much personal distress. It would be my best professional psychological opinion that administrative remedy is required to resolve the contextual, work-related problems and bring relief for Mr. Terrell's personal distress.

Dr. Coon essentially agreed with Dr. Parker. Dr. Coon's impression was that "there is no evidence of mental or emotional disorder. No diagnosis is made." Dr. Coon's conclusion was "the problems which have given rise to this evaluation do not admit to a psychiatric solution and must be dealt with administratively."

### TERRELL'S TERMINATION

Based upon the doctors' reports, Lynaugh believed that an administrative remedy such as a transfer was needed. On July 15th, Lynaugh and Scott again met with Terrell, and offered Terrell a transfer from the operations division to the finance division of TDCJ, a less stressful job. The transfer would have resulted in a reduction in salary from $56,000 to $49,000 and a loss of free housing; however, Terrell would retain all medical, insurance, and retirement benefits. No other warden's position, or anything comparable, was available in TDCJ at that time.

On July 16, 1991, Terrell wrote Lynaugh, generally restating what had been discussed in the last meeting. Before Lynaugh could reply, Terrell wrote a second letter on July 18, 1991 to Lynaugh:

. . . . .

Re: Meeting July 15, 1991

Mr. James Lynaugh,

Please excuse the constant communication from my office, but as you can imagine my employment status is very much unclear. My attempts to contact you by phone on July 17, 1991, were unsuccessful. To my understanding, the following description best reflects my position:

1. Administrative leave continues to be authorized by your office.

2. The position described in our meeting of July 15, 1991 is unsatisfactory and not accepted on a voluntary basis.

3. My status will remain as described until further instructions are issued by your office.

Respectfully submitted,

T.L. Terrell
Senior Warden
Beto One Unit

. . . . .

On July 24, 1991 Lynaugh wrote Terrell the following letter which has been described as the termination letter:

. . . . .

Dear Warden Terrell,

I apologize for not being able to return your telephone calls of July 27, 1991 but I was involved in legislative hearings the entire day. After reading your letter of July 16, 1991, I was unsure as to your intentions with regard to a change from the Operations Division to the Finance Division. Your letter of July 18, 1991 clarified your position.

It was my hope that my offer to transfer you to the Finance Division would remove you from the job-related pressures you are feeling in the Operations Division and give you a fresh start. Of course, the offer was made on the basis that you would willingly transfer and do your utmost to be productive in your new job. Your letter of July 18, 1991 makes it clear, I think, that you will not willingly accept a transfer to the Finance Division.

Please recall in our prior conversations concerning the administrative problems you were experiencing at the Beto I Unit that we agreed the divisive situation that existed between you and Regional Director Herklotz and you and certain of your unit staff could not continue. I have tried to extend extraordinary efforts to favorably resolve this situation over the past eight months. Internal Affairs has investigated three different allegations you made against Regional Director Herklotz and several members of your unit staff. As Mr. Scott disclosed to you, no evidence was found to substantiate your allegations. Further, Mr. Scott individually counseled you and the other personnel involved in this matter that personal feelings must be set aside and business conducted in a professional manner. Unfortunately, that has not happened. The divisive situation at the Beto I Unit continues due to your inability to get along with those above you in the chain of command as well as your continued display of lack of trust in both your immediate supervisors and Beto I Unit staff. You just will not accept the fact that you are in large part the cause of the problem.

You have obviously, by your letter of July 18, 1991, decided not to go along with my offer of transfer to the Finance Division. You have left me no other alternative but to terminate your employment with the Institutional Division effective July 25, 1991. I take this action regretfully but it is my duty to act in what I believe is the best interest of the Institutional Division, to protect the safety of both staff and inmates and to fulfill the mission of the agency.

You do have certain retirement and other benefit options available to you. I have asked Mr. Mosely to help you with getting the required forms and paperwork filed.

Sincerely,
James A. Lynaugh
Executive Director

The above termination letter was delivered to Terrell by Art Mosley, Assistant Director for Personnel at TDCJ–ID. Mosley explained all of his employment retirement and continued insurance benefits. Terrell began receiving a retirement check for approximately $700.00 per month, plus medical and insurance coverage benefits. Within a few months thereafter Terrell obtained a job as an Assistant Warden with a private prison system in Louisiana and was soon promoted to Warden with a $55,000 annual salary.

In his suit against TDCJ, Terrell initially plead various acts of discriminatory personnel actions; however, the case was ultimately submitted to the jury on the basis of termination only. Under the Act, Terrell's burden is to prove: (1) that he qualifies as a whistle-

blower under the statute, and (2) that TDCJ terminated him because he was a whistleblower.

## DOES TERRELL QUALIFY AS A WHISTLEBLOWER?

It is uncontested that the TDCJ is a state governmental agency, that Terrell was a public employee of TDCJ, and that he made reports to a law enforcement authority. The pertinent issue raised by TDCJ is whether Terrell reported in good faith a violation of law, within the meaning of the Act. TEX.REV. CIV.STAT.ANN. art. 6252–16a, § 1 defines "Law" as a "state or federal statute, an ordinance passed by a local governmental body, or a rule adopted under a statute or an ordinance." However, the legislative history of the Act provides little guidance in determining what constitutes "a violation of law" under the Act. In moving for passage, Representative Harrison, the bill's sponsor, simply stated, "... this is a Bill that protects State or local governmental employees from suspension or termination if they report a violation of state, local or federal law...." *The Texas Whistleblower Act: Debate on Tex. H.B. 1075 on the House Floor,* 68th Leg., R.S., (May 20, 1983). Two legal commentators described the legislative history of the Act as indicating "a doubtlessly well-intentioned but undeniably perfunctory approach that included no debate and little discussion," and that "the implications of attempting to impose a general statute applicable to all governmental employees, if that was the intent, was not carefully considered." Valerie P. Kirk and Ann Clarke Snell, *The Texas Whistleblower Act,* 26 Tex.Tech L.Rev. 75, 78 (1995).

Into this vacuum of legislative intent moved a trend towards an expansive interpretation by the courts which seems to have started at the appellate level in *Travis County v. Colunga,* 753 S.W.2d 716 (Tex.App.—Austin 1988, writ denied). In *Colunga,* the Austin Court of Appeals acknowledged the primary purpose of protecting public employees. However, the court also added a second purpose; that is, "to secure in consequence lawful conduct on the part of those who direct and conduct the affairs of public bodies." *Id.* at 718–19.

This liberal interpretation took hold and was adopted in several cases. *See Lastor v. City of Hearne,* 810 S.W.2d 742 (Tex.App.—Waco 1991, writ denied); *Castaneda v. Texas Dept. of Agriculture,* 831 S.W.2d 501 (Tex. App.—Corpus Christi 1992, writ denied); *Texas Dept. of Human Serv. v. Green,* 855 S.W.2d 136 (Tex.App.—Austin 1993, writ denied). In *Lastor,* the court stated that departing from the strict letter of a statutory provision is necessary when its literal enforcement would thwart the legislative purpose reflected by the statute as a whole. *Lastor,* 810 S.W.2d at 743–44. The court also stated that "the Act as a whole clearly evidences an all-encompassing legislative intent to encourage government employees to 'blow the whistle'". *Id.* at 744.

In *Castaneda,* the court wrote that the purpose of the Act was to "enhance openness in government and compel the government compliance with the law." *Castaneda,* 831 S.W.2d at 503. The court in that case approved the reporting of rumors and innuendos, and required no personal knowledge of the alleged legal violation on the part of the complaining employee. The court commented that it was necessary to give the Act a "liberal construction" which "does not restrict the statute but enlarges its scope in effect to effectuate the true legislative purpose". *Id.* The holding and reasoning in *Castaneda* represented an expansion in the concept of whistleblower protection beyond merely protecting an innocent employee; in fact, it actively encouraged the reporting of any activity that appeared to that employee to smack of some possible wrongdoing. This standard, which was also followed in *Green,* protects the employee no matter how reckless his behavior.

With due respect to our sister courts of appeals, we believe that to state that a statute has an "all-encompassing" intent is risky or presumptuous when the legislative history reveals nothing concrete about legislative intent. To further hold that this all-encompassing intent is to "encourage" whistleblowing is to expand the statute beyond the words provided by the bill's sponsor. The

result of these and other holdings has been a shift from a balanced provision of protection for employees who report real violations to one which encourages litigation over disagreements about whether an agency is fulfilling its administrative goals based on an employee's own personal points of view. *See Kirk & Snell, supra* at 81. It would be absurd to interpret the words "law" or "rule" to include every conceivable rule of personnel management adopted by state employees in the course of conducting their affairs, such as rules governing personnel assignments, working hours, distribution of official reports, timetables for programs and reports, planning meetings, and implementation of goals and procedures. Disagreements over chain of command, procedures, and policies can result in one or both parties characterizing the others conduct as "harassment." In short, the legislature has failed to provide a sufficient foundation within the statute itself to guide the courts in their interpretation of the Act. Because public taxpayers are ultimately responsible for compensatory and punitive damages in whistleblower cases, it is to the best interest of the public to reexamine the scope of protection provided by the Act.

In an early case under the Act, *City of Dallas v. Moreau,* 697 S.W.2d 472 (Tex. App.—Dallas 1985, no writ), the court recognized that there was a background of *public concern* against which the Act was adopted. There the court stated "there have been several highly publicized instances from around the nation wherein public employees have allegedly sustained adverse personal consequences because of testimony given to legislative bodies and regulatory boards with respect to questionable practices in their area of employment.... *[w]e are not aware of any legislative intent to protect miscellaneous complaints and discussions with fellow workers.* Neither do we perceive any great good to be achieved by fostering such conduct." *Moreau,* 697 S.W.2d at 475 (emphasis ours).

The Supreme Court of Texas has provided some guidance as to a reasonable construction of the Act's terms in *Winters v. Houston Chronicle Publishing Co.,* 795 S.W.2d 723 (Tex.1990). In his concurring opinion, Jus-

tice Doggett observed that the essence of a whistleblower is the conflict between the employee's loyalty to the employer on the one hand and his loyalty to the public good on the other. *Winters,* 795 S.W.2d at 727. The Court noted one commentator's definition of whistleblowing which is "the act of a man or woman who, believing that the *public interest* overrides the interest of the organization he served publicly blows the whistle...." (emphasis ours). *Id., citing Whistle Blowing: the Report of the Conference on Professional Responsibility* vii (R. Nader, P. Petkas & K. Blackwell eds. 1972).

Quoting *Winters,* the Austin court of appeals in *Stinnett v. Williamson County Sheriff's Dept.,* 858 S.W.2d 573 (Tex.App.—Austin 1993, writ denied), concluded that "traditionally, the Whistleblower Act has been applied to public employees who are fired in retaliation for reporting their employers' violations of law that are detrimental to *the public good or society in general.*" *Stinnett,* 858 S.W.2d at 575. In support of this assertion, the court cited several cases which illustrate that *the public good* must be a prominent factor. *See, e.g., Johnston v. Del Mar Distrib. Co., Inc.,* 776 S.W.2d 768 (Tex.App.—Corpus Christi 1989, writ denied) (violation of federal firearms regulation); *City of Ingleside v. Kneuper,* 768 S.W.2d 451, 453 (Tex.App.—Austin 1989, writ denied) (building inspector corruption); *Colunga,* 753 S.W.2d at 716 (hazardous chemical misuse); *City of Brownsville v. Pena,* 716 S.W.2d 677, 680 (Tex.App.—Corpus Christi 1986, no writ) (misuse of public funds).

■ Based upon our review of legislative background of the Act and the subsequent construction of its terms, we conclude Terrell must prove by a preponderance of the evidence that the "violation of law" that he reported would have a probable adverse effect upon the *public good or society in general.* Because almost anything that occurs within a public agency could be a concern to the public, it is helpful to address the question by inquiring whether the report of a violation of law in a particular case was made primarily in the employee's role as a citizen or primarily in his role as an employee. *See*

*Terrell v. U.T. System Police,* 792 F.2d 1360 (5th Cir.1981).

In the instant case, Terrell claims that his reports of the Flowers, Noonan, and Clay matters, as well as his letters to Chairman Hale and Governor Richards, showed violations of Rule 22 of TDCJ Executive Directive PD–21, Employee's General Rules of Conduct, which were issued pursuant to the authority vested in TDCJ by Tex.Rev.Civ.Stat. Ann. art. 4413(401), § 1.10(b) (Vernon Supp 1990) (repealed 1991).[4] He thus argues that the activities reported were "violations of law." Terrell asserts that Herklotz's conversation with Noonan, Herklotz's conversation with Terrell regarding Clay, and Herklotz's finger pointing at Terrell, as well as the baseline audit, were acts of "harassment" in violation of Rule 22 of the Employee's General Rules of Conduct which reads as follows:

> 22. **Harassing Or Retaliating Against Another:** Employees are prohibited from harassing or retaliating against another in any form or for any reason. This concludes all forms of harassment or retaliation for reasons other than sex, gender, race, color, religious preference, national origin, age or disability.

■ When both legal and factual sufficiency points are raised, we must first examine the legal sufficiency of the evidence. *Glover v. Texas Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex.1981). In reviewing a no-evidence point, the court may consider only the evidence and inferences that tend to support the jury's findings and disregard evidence and inferences to the contrary. *Sherman v. First Nat'l Bank,* 760 S.W.2d 240, 242 (Tex. 1988). If there is any evidence of probative value supporting the finding, the court must uphold the jury's finding and overrule the point of error. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). If the finding is supported by legally sufficient evidence, the court must then weigh and consider all the evidence, both in support of and contrary to the challenged finding. *Id.* The jury's findings must be upheld unless it is so against the great weight and preponderance of the evidence as to be manifestly unjust or erroneous. *Pool v. Ford Motor Co.,* 715

S.W.2d 629, 635 (Tex.1986). We are not free to substitute our judgment for the jury's simply because we may disagree with the verdict. *Herbert v. Herbert,* 754 S.W.2d 141, 142 (Tex.1988).

■ In addressing TDCJ's no evidence points, we have reviewed the record, considering only the evidence and inferences that tend to support the jury's findings and have disregarded evidence and inferences to the contrary. Terrell wrote inter-office communications containing charges against his superiors. He testified that he believed that certain conduct of TDCJ officials which he reported to higher authorities constituted violations of Rule 22 of TDCJ Executive Directive PD21. He further testified that he believed he was terminated for writing the report. Also, the letters to Chairman Hale and Governor Richards were within 90 days after making his reports which would entitle Terrell to a rebuttable presumption that he was terminated because of the reports. This evidence is legally sufficient to support the jury's findings that he was a whistleblower and that he was terminated for that reason. Accordingly, TDCJ's points of error challenging the legal sufficiency of the evidence are overruled.

In addressing TDCJ's factual insufficiency points, we have weighed and considered all the evidence, both in support of and contrary to the challenge finding. We conclude that the jury's findings are against the great weight and preponderance of the evidence.

■ The record reflects that Terrell's complaints were based primarily upon personnel matters. Terrell's report to Herklotz regarding his proposed discipline of Flowers involved a purely personnel management and internal discipline matter. Terrell's inter-office communication to Scott regarding the Noonan complaint also refers to an internal personnel management dispute. Furthermore, Terrell's inter-office communication to Scott regarding the connection between the Clay assignment and the internal audits also relates to a dispute over personnel assignments, and demonstrates no public issue.

**4.** Now Tex.Gov't Code Ann. § 492.001 *et seq.* (Vernon Supp.1996)

Terrell did not claim that the "violations of law" which he reported had a public interest. Even if he did so, he did not factually develop sufficient evidence to prove that the alleged "violations of law" which he reported had a probable adverse effect upon the public interest. Lastly, Terrell's letters to Hale and Richards simply repeated his dissatisfaction with the above personnel actions and drew some personal conclusions. These conclusions were contradicted by three investigative reports. Terrell's general claims of "illegitimate conduct," "un-principled operation of the agency," and "extensive administrative corruption throughout the agency," added no additional evidence to the three prior inter-office communications regarding Flowers, Noonan and Clay.

It is clear that the activities reported were personnel management issues which did not have a probable adverse effect upon the public. Terrell himself recognized the problems as personnel management issues, rather than violations of law affecting the public, when he stated to Dr. Coons, "here I am trying to run the biggest Unit in TDCJ with 3100 inmates with an Assistant Warden who is inept and a Major who answers only to Herklotz." We conclude, therefore, that the evidence is factually insufficient to prove that Terrell reported violations of law which were detrimental to the public good or society in general. *See Stinnett v. Williamson County Sheriff's Dept.,* 858 S.W.2d 573 at 575 (Tex. App.–Austin 1993); *Winters,* 795 S.W.2d at 727; *Moreau,* 697 S,W.2d at 475. One may sympathize with his problem, but the facts are clear that Terrell acted primarily in his role as an employee involving a personnel management issue and not as a citizen involving a public issue.

■ Even if the reported incidents did not constitute "violations of law," Terrell could nevertheless be a whistleblower if his reports were made in "good faith". *See Lastor,* 810 S.W.2d at 742. The concurrence in *Winters* suggested the following two-part test for "good faith": (1) that the employee undertook to report the activities in the workplace in good faith rather than as a result of some less admirable motive such as malice, spite, jealousy, or personal gain; and (2) the em-

ployee had reasonable cause to believe that the activities would have a probable adverse effect on the public. *Winters,* 795 S.W.2d at 732. Terrell points out that there is evidence showing that he was an honest man, that he had excellent annual evaluation reports, and that he was conscientious. Furthermore, the reports themselves show that he probably believed that Herklotz was guilty of harassment under Rule 22 of the Employee's General Rules of Conduct.

Although there may be a scintilla of probative evidence supporting the jury's finding of good faith, we conclude that the jury's findings are against the great weight and preponderance of the evidence. The record demonstrates in a convincing manner that Terrell was motivated by his on-going conflict with Herklotz. Terrell believed Flowers had been placed in his unit by Herklotz to gather information. Terrell admitted that he did not want Flowers in his unit, and brought formal charges against Flowers for gross negligence of duty related to a stabbing incident where at least two other officers involved were not charged. Terrell's focus upon this incident led him to become suspicious of subsequent conversations between Herklotz and Noonan conducted at an outside meeting. Terrell intentionally sought to irritate Herklotz by giving Clay, a known adversary, a field assignment that was contrary to Herklotz's wishes. Terrell assumed that a subsequent internal audit was ordered by Herklotz in retaliation for Terrell's assignment of Clay when, in reality, the audit was ordered beforehand. Terrell and Herklotz met to discuss these matters, and the meeting ended on a cooperative note with Herklotz unequivocally supporting Terrell in his job as warden and Terrell acquiescing in Herklotz's position on personnel assignment matters. Nevertheless, Terrell wrote Scott three days later in a continuing effort to maintain the controversy. The foregoing evidence clearly reflects that Terrell was motivated by his on-going personality conflict with Herklotz over management and personnel differences. Therefore, the first part of the good-faith test set forth in *Winters* has not been met.

We next inquire as to whether Terrell had reasonable cause to believe that the reported activity would have a probable adverse effect upon the public. Terrell's letters to Hale and Richards could be construed as an expression of concern involving the public interest. However, after considering all the evidence, the jury's finding on this point is against the overwhelming weight of the evidence. At no time did Terrell affirmatively express a concern for the public's interest. With 21 years of experience as a law enforcement officer and warden, Terrell should have known the difference between activity which is wholly personnel management of TDCJ, and activity which is a violation of law having a probable adverse effect on the public. The evidence is overwhelming that he knew he was making the reports primarily in his role as an employee, and not as a citizen. We therefore conclude that the evidence was factually insufficient to prove good faith under the Act.

Having held that there is insufficient evidence to support a finding that Terrell reported a violation of law in good faith, point of error one is sustained.

### WERE TERRELL'S REPORTS THE CAUSE OF HIS TERMINATION?

 Assuming, arguendo, that Terrell had qualified as a whistleblower, we will address the question of whether his termination was caused by his reported alleged violations of the law. Blowing the whistle and being thereafter terminated is not enough. There must be a causal link between the two. *Texas Dept. of Human Serv. of the State of Texas v. Hinds,* 38 Tex.Sup.Ct.J. 711 (June 10, 1995); *Blocker v. Terrell Hills City,* 900 S.W.2d 812 (Tex.App.—San Antonio 1995, writ denied). Whether making the report was the sole reason for the employer's actions, one reason among others, or something in between, was resolved by the Supreme Court in *Hinds.* There, the court concluded that a public employee can recover under the Act only if he proves that he was terminated *because* he reported a violation of law. *Hinds,* 38 Tex.Sup.Ct.J. at 714. In further

explaining this standard of causation in whistleblower cases, Justice Hecht stated that "the employee's protected conduct must be such that without it, the employer's prohibited conduct would not have occurred when it did." *Id.* Justice Hecht reasoned that "this best protects employees from unlawful retaliation without punishing employers for legitimately sanctioning misconduct or harboring bad motives never acted upon." [5]

The Act expressly places the burden of proof on the employee. It further provides for a rebuttable presumption that the employee was terminated for reporting a violation of law if the employee is terminated not later than the ninetieth day after making a report in good faith. The only "reports" within this ninety-day period were the letters by Terrell to Hale and Richards. However, as discussed, the evidence demonstrates that Terrell was terminated for reasons unrelated to those two letters. The record shows that a divisive situation had existed at Beto I for some time. Internal Affairs had conducted exhaustive investigations of four different complaints by Terrell against Herklotz, Flowers, and other staff at Beto I. Each investigation found insufficient evidence to support Terrell's allegations. Although, over a two-year period, Terrell opposed TDCJ policies and personnel decisions made by his superiors, and even went outside the chain of command in doing so, TDCJ officials, nevertheless, took no action against him for it but rather tried to continue to work with him to remedy the problems at Beto I. Wayne Scott, Deputy Director of TDCJ–ID, had met and counseled with Terrell concerning the problems at Beto I. Scott had confidentially told Terrell that he and Herklotz would probably be transferred away from each other. Terrell agreed that the job was stressful and he further agreed that there was low morale at Beto I. Terrell voluntarily underwent psychological evaluation and counseling, and received a recommendation by two doctors that administrative measures be adopted to alleviate his stress.

Several employees who were close to the operations of Beto I also confirmed in their testimony that there were divided camp loyalties at Beto I, and that the employees simply were not focused on their jobs. Hale

**5.** The 1995 amendment to the Act appears to address this causal link discussed in *Hinds;* however, the Supreme Court expressed no opinion regarding the amendment nor do we in the present case.

testified that Terrell was suffering from the pressure of the problems, and that he was becoming paranoid and unfocused. Janie Cockrell, the warden who replaced Terrell, and Mike Moore, the new regional director who replaced Herklotz, both confirmed in their testimony that they found the morale at Beto I to be low, and that there was a definite division of employees. Lynaugh's testimony also provided a clear indication that Terrell's termination resulted from matters unrelated to his "whistleblower" reports. He stated that there was a clear need to effectuate an administrative remedy to Terrell's problems at Beto I, and that he believed that transferring personnel was a reasonable administrative remedy. Lynaugh testified that he could not have someone in charge of the training of new TDCJ–ID security employees, a formidable and important job, who could not voluntarily accept the responsibilities of that position. Both Terrell and Herklotz had to be moved out of Beto I and the Northern Region. Since the training directorship was the best available position for Terrell at that time, Lynaugh offered Terrell this transfer at a meeting on July 15, 1991. Lynaugh did not expect Terrell to like being transferred to Huntsville, but made it clear that voluntary acceptance by Terrell was a prerequisite to resolving the situation. In keeping with their efforts to deal with the problem, TDCJ transferred Herklotz, Flowers and Kinker by September 1, 1991. In the letter of July 16, Terrell expressed some reluctance to the transfer, but did not withdraw his voluntary acceptance of same. However, Terrell's subsequent letter of July 18, made it clear that the transfer was not accepted on a voluntary basis. The July 18th letter was a clear indication that the history of difficulties with Warden Terrell had not been resolved, and probably could not be resolved. As suggested by Lynaugh in his letter of July 24, this history was a long and hard one. The evidence is clear that the reasons Terrell was terminated were precisely those expressed in the Lynaugh letter of July 24. Terrell no longer could effectively manage Beto I, and was suffering from the stress of the job. He refused to voluntarily accept a transfer to TDCJ–Finance Division in Huntsville as director of training. These reasons are independent of any attempt by Terrell to cover the problem by turning himself into a whistleblower. Moreover, the evidence shows that Terrell's termination had nothing to do with the complaints that he made or the letters that he wrote to Chairman Hale or Governor Richards. All of the internal investigations determined that Terrell's complaints were without merit. Terrell has not demonstrated that the matters reported were violations of law having a public interest or concern nor has he demonstrated that he was terminated because he made such reports. To the contrary, the evidence is overwhelming that Terrell was terminated for other reasons. TDCJ factual insufficiency points are, therefore, sustained.

In view of our holding on points one and two, it will be unnecessary for us to address points three, five, and six. We reverse the judgment below and remand the case to the trial court for a new trial.