**Fred ROGERS, Appellant and Appellee,**

v.

**CITY OF FORT WORTH, Appellee and Appellant.**

**No. 2–01–207–CV.**

Court of Appeals of Texas, Fort Worth.

Oct. 17, 2002.

---

**2.** The amended judgment on remand does not provide for the compounding of this interest

per annum.

Law Office of Art Brender, Art Brender, Jason C.N. Smith, Fort Worth, for appellant/cross appellee.

Theodore P. Gorski, Jr., Elizabeth T. Dierdorf, Assistant City Attorneys, Fort Worth, for appellee/cross appellant.

PANEL B: DAY, LIVINGSTON, and GARDNER, JJ.

## OPINION

ANNE GARDNER, Justice.

### Introduction

In this appeal, the primary issue we must decide is whether the Texas Whistleblower Act [1] protects an employee who

---

1. TEX. GOV'T CODE ANN. §§ 554.001.004 (Vernon Supp.2002), § 554.005 (Vernon 1994), §§ 554.006.009 (Vernon Supp.2002).

reports a violation of law at the direction of his supervisor rather than on the employee's own initiative. Because we conclude that such an employee is protected, we reverse the trial court's judgment for the City and remand for entry of a judgment for the former employee, Fred Rogers.

## Background Facts

The City employed Rogers from March 1997 to July 8, 1998 as a temporary-duty deputy marshal in the City's municipal court. As a temporary employee, Rogers had no appeal rights under the City's grievance procedures.

On June 1, 1998, Deputy Marshal Stan Bastek submitted a memo to City Marshal Jim Rutledge, in which Bastek complained of Rogers's alleged ticket fixing and use of profanity. Rutledge also received a memo from Rogers, in which Rogers stated that he had been informed by Twyla Warrior, a municipal court deputy clerk, of Bastek's ticket-fixing allegations and considered them harassment. In response to questions from Rutledge through her supervisor, Warrior stated that she did not recall the alleged ticket-fixing incident and had not heard Rogers mention ticket-fixing.

On June 2, 1998, Rutledge received copies of two customer-survey forms that complained about Bastek. One was unsigned, dated May 28, 1997, and indicated that Bastek had been rude to a customer. The other form was dated May 28, 1998, indicated that Bastek had been rude and had not appeared to want to provide service to the customer, and was signed by "Saint Coleman." Rutledge asked Sergeant Demetrius Warren "to look into them."

On the evening of June 18, 1998, another deputy marshal, Gordon Burrell, arrested Troyce Clater. At the time of his arrest, Clater had ten outstanding capias warrants that totaled $2,666. The Fort Worth Marshal's Office General Orders Manual provides that a prisoner with four or more capias warrants shall be taken directly to the Tarrant County Jail. However, it was commonplace for the municipal court's cashiers to accept checks for warrants before a prisoner was taken to jail because the municipal court clerk did not have a uniform policy about when checks would or would not be accepted in payment of fines. Clater also told Burrell that he (Clater) was related to a law enforcement officer, whom Burrell knew.

Before taking Clater to jail, Burrell called Clater's mother and learned that she had the money to pay the outstanding fines of $2,666. He then called his supervisor, Sergeant Perez, to determine if the City would take Clater's mother's check. Perez, who knew it was commonplace for cashiers to take personal checks for warrants, told Burrell that with proper identification Clater's mother could "write a check for the full amount."

The cashier would not take Clater's mother's check, however, so Burrell called Perez a second time. Perez advised Burrell to take both Clater and the check to Judge Newman–Stanfield, a municipal court judge. Burrell took Clater before the judge just before the end of the court's day and explained that Clater's parents owned a legitimate business and had the money to pay off the warrants. Judge Newman–Stanfield became irritated and told Burrell to take Clater to jail. She told Burrell that he knew better than to bring a prisoner into her courtroom with ten capias warrants in hopes of paying by check rather than in cash. In response, Burrell indicated that he wanted the judge to work with him because he knew Clater's family. As Burrell left the courtroom, Rogers, the on-duty bailiff, told Burrell not to worry about the judge's reaction; she

was irritated because "it's been one of those nights, everyone had been bringing people in here all day long with capias warrants and she's tired of it."

Before leaving for the evening, Judge Newman–Stanfield sought out Perez to report that she believed Burrell had engaged in improper conduct by asking her to work with him regarding Clater's situation because Burrell knew Clater's family. Perez was not in his office, but Judge Newman–Stanfield spoke with him by telephone and told him she was "[l]ivid with the situation" because persons with capias warrants were not to be taken to court, and marshals were not supposed to be defense attorneys for persons they brought to court. Judge Newman–Stanfield told Perez she was tired of these things happening and that she wanted Perez to make sure that they did not happen again.

Perez apologized for the incident and then contacted Burrell on the radio to ensure that Clater was being taken to jail. While she was still in Perez's office, Judge Newman–Stanfield overheard the ensuing radio conversation between Burrell and Perez. In the conversation, Burrell related the earlier events in the courtroom, and both officers discussed the fact that the judge was angry with them. Perez then told Burrell to "Build a bridge and get over it, because she is the Judge" and also said, "That's why we have underwear made out of Kevlar®." [2] Because Judge Newman–Stanfield was upset about what had happened in her courtroom and what she had heard in Perez's office, she told Rogers that evening to write an Interoffice Correspondence (IOC). The next day, Judge Newman–Stanfield reported to Rutledge what had happened the night before.

In response to the situation, Perez told everybody involved to write an IOC, and

Rutledge also directed that IOCs be written. Rogers and five other deputy marshals—Burrell, Perez, Sanders, Wedel, and Estorga—submitted IOCs. In his IOC, which he prepared on June 19, Rogers stated that Burrell had pleaded with Judge Newman–Stanfield several times to take Clater's mother's check because Clater was a "good guy" and his brother was a police officer and that he (Burrell) was only doing what his supervisor had told him to do. None of the other deputies except Burrell were in Judge Newman–Stanfield's courtroom when the incident occurred. Sanders and Wedel were in or near Perez's office and reported hearing Judge Newman–Stanfield complain to Perez about Burrell bringing Clater into her courtroom and acting as his defense attorney. In accordance with the usual procedure, Burrell was given an opportunity to respond to the IOCs that were written about the June 18 incident. Burrell told Rutledge that he believed Rogers had lied in his IOC.

Meanwhile, on June 26, 1998, Sergeant Warren reported to Rutledge that Warren's investigation had revealed the customer-survey complaint signed by Saint Coleman was "totally fictitious" because there was no one by the name of Saint Coleman at either the address or telephone number given on the form. Warren suggested to Rutledge that perhaps Rogers might have completed the two customer-survey forms. In addition to the similarity of the handwriting on each form, Warren knew that Rogers and Bastek had had previous "run-ins" over an off-duty job and allegations of Rogers's ticket-fixing and use of profanity.

On June 30, Bastek asked Rutledge to drop all of the complaints Bastek had initiated against Rogers. Rutledge replied

2. Kevlar® is a fabric used in bullet-proof vests.

that he planned to go forward with the ticket-fixing allegation. On July 1, Rutledge met with Rogers and followed up on Burrell's comment that Rogers had lied on his IOC. Rogers told Rutledge that his report of the Burrell incident was "factual as reported." Also in the July 1 meeting, Rutledge provided Rogers a copy of a memo he had received from Bastek on June 1 regarding the profanity and ticket-fixing allegations.

Rutledge instructed Rogers to provide a written response to the allegations by July 8, 1998. Rutledge did not mention the customer-survey forms, however. During the meeting, Rogers asked whether he was going to be fired. Rutledge stated that he had no plans to fire Rogers, but warned Rogers that he had aligned himself "too strongly" with the judges and prosecutors and that that could "create problems."

On July 2, Rutledge reprimanded Perez and Burrell by written notice for violating the Marshal's General Orders. Rutledge reprimanded Perez for being disrespectful and for unprofessional conduct in the comments overheard by Judge Newman–Stanfield. He reprimanded Burrell for being disrespectful and for "acting as a defense attorney for the arrested person."

Also on July 2, Rutledge received Rogers's written response to the allegations in Bastek's June 1 memo. Following up on Warren's surmise, Rutledge compared the name "Bastek" handwritten in Rogers's response with "Bastek" written on the two customer-survey forms. From that comparison, Rutledge concluded that the same person might have written all three exhibits. Rutledge reported his suspicions to Elsa Paniagua, the Municipal Court Services Director, and Charles Boswell, an Assistant City Manager.

Rutledge then met with Rogers and asked him about the customer-survey forms containing Bastek's name. Rogers admitted that the handwriting on the forms was his, but stated that he did not fill out the forms and protested that he was being set up. Rutledge then discharged Rogers for falsifying the unsigned customer-survey form dated May 1997. Based on his investigation, Rutledge concluded that Rogers's handwriting did not appear on the customer-survey complaint form signed by "Saint Coleman." Accordingly, Rogers was not terminated for falsifying that customer-survey form or for ticket-fixing or use of profanity.

Rogers filed suit, alleging that his termination was in violation of the Texas Whistleblower Act. The trial court denied the City's motion for summary judgment, and the case proceeded to trial before the court. After hearing all of the evidence, the trial court found:

- Fort Worth City Ordinance prohibits any City employee from representing or acting as an attorney for any individual before any Fort Worth municipal court.
- Rutledge asked Rogers to change his IOC statement regarding Burrell's conduct on June 18 and was hostile to Rogers's account of the incident.
- Rogers made a good faith report of a violation of law by Burrell to appropriate law enforcement authorities.
- Rutledge was aware of the report; Rogers wrote it at Rutledge's request.
- Rogers was terminated because he made the report and would not have been terminated if he had not made the report.

In its sole conclusion of law, however, the trial court held:

I find that this report on which the Plaintiff has based his case does not violate Article 554.002 of the Texas Government Code. *This type of report cannot be the kind of activity that the Leg-*

*islature intended.* I therefore find for the Defendant and hope, that should Plaintiff desire to appeal my decision the Court of Appeals, will have adequate findings to support any ruling they make without a second trial. [Emphasis supplied.]

Based on this conclusion, the trial court rendered a take-nothing judgment in favor of the City.

## Report of Violation of Law

 The Whistleblower Act prohibits a state or local government from terminating the employment of a public employee who in good faith reports a violation of law by another public employee to an appropriate law enforcement agency. TEX. GOV'T CODE ANN. § 554.002(a). The Act is remedial in nature and must be liberally construed. *Castaneda v. Tex. Dep't of Ag.,* 831 S.W.2d 501, 503 (Tex.App.-Corpus Christi 1992, writ denied). Its purposes are (1) to enhance openness in government by protecting public employees who inform proper authorities of legal violations and (2) to secure governmental compliance with the law on the part of those who direct and conduct governmental affairs. *Upton County v. Brown,* 960 S.W.2d 808, 817 (Tex.App.-El Paso 1997, no pet.); *Tarrant County v. Bivins,* 936 S.W.2d 419, 421 (Tex.App.-Fort Worth 1996, no writ).

In his sole issue on appeal, Rogers challenges the trial court's conclusion that his report of the Burrell incident was not the type of activity that the Legislature intended to be protected by the Act. In its second issue, the City challenges the legal and factual sufficiency of the evidence to support the trial court's finding that Rogers reported a violation of law, contending that Rogers's account of the Burrell inci-

dent was not a report of a violation of law that is protected by the Act.

 The issue of whether Rogers reported a violation of law presents a question of law rather than fact. The term "law" is defined in the Act, and statutory construction is a question of law. *Havlen v. McDougall,* 22 S.W.3d 343, 345 (Tex. 2000); *Johnson v. City of Fort Worth,* 774 S.W.2d 653, 656 (Tex.1989); *see also Tex. Dep't of Transp. v. Needham,* 82 S.W.3d 314, 317 (Tex.2002) (addressing construction of "appropriate law enforcement authority" under the Act as a question of law). *But see Tex. Dep't of Crim. Justice v. Terrell,* 925 S.W.2d 44, 59 (Tex.App.-Tyler 1995, no writ) (addressing "law" as an issue of fact). Accordingly, we will review the trial court's determination that Rogers reported a violation of law under a de novo standard of review rather than under a legal and factual sufficiency standard. *See Needham,* 82 S.W.3d at 317; *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 928 (Tex.1998), *cert. denied,* 526 U.S. 1144, 119 S.Ct. 2018, 143 L.Ed.2d 1030 (1999).

The Act provides that a "law" includes an ordinance of a local governmental entity. TEX. GOV'T CODE ANN. § 554.001(1)(B). The Fort Worth City Code in effect when Rogers prepared his IOC provided: "[I]t is hereby declared unlawful for any officer or employee of the city to be involved, directly or indirectly, in the defense of any person charged with the violation of an ordinance of the city . . . in or before the municipal courts of the city, except to give evidence in open court." Burrell was disciplined for representing Clater in a municipal court proceeding. Accordingly, Rogers reported a violation of law in his IOC.[3]

3. The Marshal's General Orders also included a regulation that provided: "No employee

shall represent, directly or indirectly, any other private person, group, or interest in any

The City asserts that Rogers did not report a violation of law unless he made his report primarily as a citizen, not an employee, and the reported violation concerned an activity or conduct that would have a probable adverse effect on the public good or society in general. To support its position, the City relies primarily on the Tyler Court of Appeals' statement in *Terrell* that a governmental employee must prove

> that the "violation of law" that he reported would have a probable adverse effect upon the *public good or society in general.* Because almost anything that occurs within a public agency could be a concern to the public, it is helpful to address the question by inquiring whether the report of a violation of law in a particular case was made primarily in an employee's role as a citizen or primarily in his role as an employee.

925 S.W.2d at 58 (citing *Terrell v. U.T. Syst. Police,* 792 F.2d 1360, 1362–63 (5th Cir.1986) (a First Amendment case), *cert. denied,* 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987)). But if a statute defines a term, we are bound to construe that term by its statutory definition only. TEX. GOV'T CODE ANN. § 311.011(b) (Vernon 1998); *Needham,* 82 S.W.3d at 317; *Transport Ins. Co. v. Faircloth,* 898 S.W.2d 269, 274 (Tex.1995). Thus, we cannot append the *Terrell* factors to the Act's definition of what constitutes a "law."

The Tyler Court of Appeals did not consider whether Terrell had reported a violation of a statute or city code. Terrell's complaints were based primarily on alleged violations of an internal departmental rule that prohibited employees from harassing or retaliating against each other. Citing that rule, Terrell complained of improper investigation procedures based on personal animosity. *Terrell,* 925 S.W.2d at 48–53, 59. Although Terrell asserted that the rule was issued pursuant to authority conferred on the Texas Department of Criminal Justice (TDCJ) by the legislature, the court did not address that argument. *Id.* at 59. In this case, it is clear that Burrell's conduct violated the city code—a "law" under the Act—which in turn specifically stated that Burrell's conduct was "unlawful."

In addition, unlike the alleged violations in *Terrell,* the violation of law that Rogers reported had the potential for much farther-reaching adverse societal implications. While TDCJ may have benefitted internally from the enforcement of a rule that prohibited harassment and retaliation, the rule's violation cannot be said to have had a "probable" adverse effect on society in general. Conversely, the City code provision at issue here prohibited city employees, which included deputy marshals, from defending persons in municipal court who were charged with the violation of city ordinances. The violation of such an ordinance would create a serious conflict of interest for the City: the peace officers charged with enforcing the law would be defending the very persons they arrested.

Also, such a violation would, at the very least, give rise to the appearance of impro-

---

action or proceeding in the Municipal Courts of Fort Worth." Because the record shows that Rogers believed he was reporting a city code violation in his IOC, we need not consider whether this regulation was "a rule adopted under a statute or ordinance" and therefore a law under the Act. TEX. GOV'T CODE ANN. § 554.001(1)(C); *see also Harris County v. Grabowski,* 922 S.W.2d 954, 955–56 (Tex.

1996) (holding that deputy's belief that he had reported a violation of law was not reasonable where the violation was simply that of an internal departmental policy); *Ruiz v. City of San Antonio,* 966 S.W.2d 128, 130 (Tex.App.-Austin 1998, no pet.) (holding that the Act does not protect reports of violations of internal policy not promulgated pursuant to statute or ordinance).

priety on the part of the marshal's office.— particularly in circumstances such as those presented here, where Burrell repeatedly asked Judge Newman–Stanfield to work with him because one of Clater's relatives was in law enforcement. Such conduct could create the public perception that the marshal's office showed favoritism towards the relatives of law enforcement employees. This type of public perception would result in distrust of law enforcement personnel and undermine public confidence in the marshal's office in particular. Thus, turning a blind eye to this type of violation would have a probable adverse effect on the public good.

Further, while it appears that Rogers made his report primarily in his role as an employee rather than as a citizen, we decline to hold, based on this fact, that Rogers did not report a violation of law. *See City of Weatherford v. Catron*, 83 S.W.3d 261, 270 (Tex.App.-Fort Worth 2002, no pet.) (rejecting city's argument that city water plant manager was "simply doing his job" when he reported low chlorine levels in city's water supply to Texas Natural Resources Conservation Commission); *City of San Antonio v. Heim*, 932 S.W.2d 287, 290–91 (Tex.App.-Austin 1996, writ denied) (op. on reh'g) (holding that police officer who, in the course of his employment, arrested an off-duty officer for driving while intoxicated reported a violation of law within the meaning of the Act); *Castaneda*, 831 S.W.2d at 503 (holding that public employee who participated in investigation at the request of law enforcement authorities reported a violation of law protected by the Act).

We also decline to apply the federal court decision in *Huffman v. Office of Personnel Management*, 263 F.3d 1341 (Fed. Cir.2001). In that case, the Federal Circuit held that a public employee who, as a part of his normal job duties reports employee wrongdoing through normal channels, is not protected by the federal Whistleblower Protection Act (WPA). *Id.* at 1352. The *Huffman* court reached this conclusion after reviewing the legislative history of the WPA, which indicated that the WPA was enacted to "protect employees who go above and beyond the call of duty in reporting infractions in the law that are hidden." *Id.* at 1353.

This case is not governed by the WPA, and the City does not direct us to any similar legislative history underlying the Act. Although the bill sponsor indicated, without elaboration, that the Act was modeled after the WPA, nothing in the pre-enactment discussion indicated that the Act was intended to except from protection public employees who reported violations of law as part of their normal duties. Valerie P. Kirk & Ann Clarke Snell, *The Texas Whistleblower Act: Time For A Change*, 26 Tex. Tech. L. Rev. 75, 78 & n. 9 (1995). To the contrary, the bill sponsor merely stated, "[T]his is a bill that protects state or local governmental employees from suspension or termination if they report a violation of state, local or federal law." *Id.; accord Terrell*, 925 S.W.2d at 57. Likewise, the Act simply states that it was enacted for "the protection of public employees who report a violation of law." Act of May 30, 1983, 68th Leg., R.S., ch. 832, 1983 Tex. Gen. Laws 4751, 4751; *see also Wichita County v. Hart*, 917 S.W.2d 779, 785 (Tex.1996) (noting same). In addition, *Huffman* is contrary to our own precedent and other Texas cases, which hold that a public employee who reports a violation of law in the course of his employment *is* protected by the Act. *Catron*, 83 S.W.3d at 270–71; *Heim*, 932 S.W.2d at 290–91.

"The Whistleblower Act protects public employees who attempt to report illegal activity." *Hart*, 917 S.W.2d at 784. Be-

cause Rogers reported an actual violation of law in his IOC, we hold that the trial court properly "found," i.e., concluded, that Rogers reported an illegal activity. We further hold that, because Rogers reported an actual violation of law, his report is protected by the Act. We sustain Rogers's issue and overrule the City's second issue.

## Good Faith

In its first issue, the City asserts that Rogers did not report a violation of law in good faith when he prepared his account of the Burrell incident. The City also contends that the trial court's conclusion of law is correct because, when coupled with the trial court's finding that Rogers wrote his report at Rutledge's request, the conclusion shows that the trial court found Rogers lacked a good faith belief that he was reporting a violation of law.

Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points,* 806 S.W.2d 791, 794 (Tex.1991). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996); *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994). Conclusions of law may not be challenged for factual sufficiency, but they may be reviewed to determine their correctness based upon the facts. *Forbis v. Trinity Universal Ins. Co.,* 833 S.W.2d 316, 319 (Tex.App.-Fort Worth 1992, writ dism'd).

The Texas Supreme Court has defined good faith to mean that (1) the employee believed that the conduct reported was a violation of law and (2) the employee's belief was reasonable in light of the employee's training and experience.

*Hart,* 917 S.W.2d at 784. The first prong of this test takes into consideration the employee's subjective belief: whether the employee honestly believed the conduct reported was a violation of law. *Id.* at 784–85. The second prong is objective because it measures the employee's belief against that of a reasonably prudent employee in similar circumstances. *Id.* at 785. The City contends the evidence is legally and factually insufficient to establish that Rogers had a good faith belief that the City violated either its own internal policies in the marshal's general orders or the city code.

There is legally and factually sufficient evidence that Rogers honestly believed Burrell's conduct was a violation of law. Rogers testified that he believed he was reporting a violation of the Fort Worth City Code in his IOC. Although Rogers wrote the IOC because Judge Newman–Stanfield and Sergeant Perez asked him to, he also did so because the deputy marshals were obligated to prepare a report if there was a violation of departmental policy or law. Rogers also testified that he felt obligated as a citizen to report violations of law. Rogers's comments to Burrell that "it had been one of those nights" with everyone bringing capias prisoners in and not to worry about it are some evidence that Rogers did not believe Burrell's conduct was a violation of law. But Rogers stated in his report that he made these comments to diffuse the tension created by the situation.

The trier of fact has several alternatives available when presented with conflicting evidence: it may believe one witness and disbelieve others and may resolve inconsistencies in the testimony of any witness. *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986). Thus, the trial court was free to believe Rogers's

testimony that he believed he was reporting a violation of law when he wrote the IOC and was also free to resolve any inconsistencies in Rogers's testimony.

There is also legally and factually sufficient evidence that Rogers's belief was reasonable in light of his training and experience. Rogers testified that he believed he was reporting a violation of law because Burrell was acting as an attorney for an arrestee, something the marshals had been told not to do and which had been discussed several times in their meetings. In addition, as we have already noted, Rogers testified that, when he prepared his report, he was aware of the City Code provision making it unlawful for city employees to defend persons in municipal court. The fact that Rogers reported the violation at the request of a judge and his supervisor does not detract from his belief that a violation had occurred or from the fact that the belief was reasonable.

The *Grabowski* case on which the City relies is distinguishable from this situation. Unlike Rogers, Grabowski, a county deputy, presented no evidence of a law he believed had been violated other than his department's internal policies. The supreme court therefore concluded that Grabowski's belief was unreasonable in light of his training and experience. 922 S.W.2d at 955–56.

The City points out that Rogers's own statements to Burrell indicated that other deputy marshals had engaged in the same conduct as Burrell, and on the same day, but that Rogers did not report them. The City also seems to suggest that Rogers's belief was not reasonable because the law was often ignored by the marshal's office and by some of the municipal court judges. The fact that actions like Burrell's were commonplace, often went unreported, and were even tolerated by some of the municipal court judges may be some evidence

that Rogers's belief was not objectively reasonable in light of his training and experience. But it may also be evidence that the marshal's office simply ignored the law and some of the municipal judges allowed them to get away with it. Indeed, Rutledge's own diary shows that he frowned upon deputy marshals aligning themselves "too strongly" with the municipal judges and prosecutors because he considered such ties to "create problems." If Rogers was aware of this mindset before he wrote his IOC, it would certainly have deterred his reporting of any legal violations that municipal judges tolerated, except at the specific direction of a judge or his supervisor.

The City also contends that Rogers did not mention the city code sections in his IOC or in his pleadings until after the City filed a no-evidence motion for summary judgment and that, when all of the evidence is reviewed, the trial court's finding that Rogers's report was in good faith is against the great weight and preponderance of the evidence. The earlier versions of Rogers's pleadings are not in the record, so we cannot compare them to his live pleading at the time of trial. There is evidence that the city code provision was not well known in the marshal's office or in the municipal courts. Judge Newman–Stanfield admitted that she did not know of the ordinance, and Rutledge testified that he was not "really aware" of the code provision before trial. But there is no evidence in the record that Rogers was unaware of the code provision, and Rogers testified that he believed he was reporting a violation of the provision when he prepared his IOC. In addition, the trial judge stated that he did not believe a thing that Rutledge had said. As the trier of fact, the trial court was free to believe Rogers and disbelieve Rutledge and resolve any inconsistencies in their testimony.

Further, this is not a situation in which the public employee's belief—albeit in good faith—that the violation of law had occurred was incorrect. As the evidence in this case shows, Rogers's good faith belief that a law had been violated was correct: Burrell's actions violated a city code provision. We overrule the City's first issue.

### Causation

 In its third through fifth issues, the City contends that the evidence is legally and factually insufficient to prove causation-that Rogers was terminated because of his account of the Burrell incident in his IOC. In these issues, the City challenges the following trial court findings:

- Rutledge asked Rogers to change his IOC regarding Burrell's conduct and was hostile to Rogers's good faith report.
- The City attempted to concoct other reasons for terminating Rogers.
- Sergeant Perez had several disciplinary actions, some of which were more severe than any conduct against Rogers, and Perez was not terminated by Rutledge or the City.

When a public employee is terminated within ninety days after reporting a violation of law, a rebuttable presumption arises that the termination occurred because the employee made the report. Tex. Gov't Code Ann. § 554.004(a). The City concedes that Rogers was terminated within ninety days of filling out his IOC, but contends that it rebutted the presumption by producing evidence that Rogers was terminated for improperly completing a customer-survey form that disparaged Deputy Bastek. The City further contends that, because it rebutted this presumption, Rogers had the burden of proving a causal nexus between his reporting of the violation of law in his IOC and his

termination. *See Tex. Natural Res. Cons. Comm'n v. McDill,* 914 S.W.2d 718, 723–24 (Tex.App.-Austin 1996, no writ) (holding that, because the rebuttable presumption does not shift the burden of proof, once sufficient evidence is produced to support a finding of the nonexistence of the presumed fact, the case proceeds as if no presumption ever existed).

The City put on evidence that Rogers was terminated for falsifying a single, unsigned customer-survey form dated May 1997, which indicated that Deputy Bastek had been rude to a city customer. Because this evidence, if believed by the fact finder, would rebut the presumption that Rogers was terminated for reporting a violation of law, we will conduct our evidentiary review as if the presumption did not exist. *Tex. A & M Univ. v. Chambers,* 31 S.W.3d 780, 784 (Tex.App.-Austin 2000, pet. denied) ("[T]here is no presumption aiding the plaintiff after the presumption is rebutted by positive evidence to the contrary.") (quoting *Robertson Tank Lines, Inc. v. Van Cleave,* 468 S.W.2d 354, 358 (Tex.1971)). However, because the City's evidence does not conclusively establish that Rogers was terminated for falsifying the customer-survey form, rather than because of his IOC, the timing of Rogers's termination is a fact that the trial court, as fact finder, was free to consider in arriving at its findings. *See Southland Life Ins. Co. v. Greenwade,* 138 Tex. 450, 159 S.W.2d 854, 857–58 (1942); *Tomhave v. Oaks Psychiatric Hosp.,* 82 S.W.3d 381, 386–87 (Tex.App.-Austin 2002, pet. filed); *Pete v. Stevens,* 582 S.W.2d 892, 895 (Tex. Civ.App.-San Antonio 1979, writ ref'd n.r.e.) (all holding that, even after a rebuttable presumption disappears, the facts and circumstances that gave rise to the presumption are themselves evidence to be considered by the fact finder).

To prove causation in a whistleblower case, an employee need not prove that his reporting of the illegal conduct was the sole reason for the employer's adverse action. *Tex. Dep't of Human Servs. v. Hinds*, 904 S.W.2d 629, 636 (Tex. 1995); *City of Fort Worth v. Zimlich*, 975 S.W.2d 399, 406 (Tex.App.-Austin 1998), *rev'd in part on other grounds*, 29 S.W.3d 62 (2000). Rather, to show causation, a public employee must demonstrate that after he reported a violation of law, in good faith, to an appropriate law enforcement authority, the employee suffered discriminatory conduct by his employer that would not have occurred when it did had the report not been made. *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 67 (Tex.2000); *Hinds*, 904 S.W.2d at 637. This causation standard has been described as a "but for" causal nexus requirement. *McDill*, 914 S.W.2d at 723.

Circumstantial evidence may be sufficient to establish a causal link between the adverse employment action and the reporting of the illegal conduct. *Zimlich*, 29 S.W.3d at 69. Such evidence includes: (1) knowledge of the report of illegal conduct; (2) expression of a negative attitude toward the employee's report of the conduct; (3) failure to adhere to established company policies regarding employment decisions; (4) discriminatory treatment in comparison to similarly situated employees; and (5) evidence that the stated reason for the adverse employment action was false. *Id.; Continental Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex.1996). But evidence that an adverse employment action was preceded by a superior's negative attitude towards an employee's report of illegal conduct is not enough, standing alone, to show a causal connection between the two events. There must be more. *Zimlich*, 29 S.W.3d at 69.

In this case, there is evidence that Rutledge knew of Rogers's report of Burrell's illegal conduct, expressed a negative attitude towards Rogers's report, and failed to adhere to established policies when terminating Rogers. There is also evidence that the stated reason for Rogers's termination was false. It is undisputed that Rutledge knew of Burrell's misconduct and disciplined him for it. The City concedes as much, although it asserts that Rutledge could not have deduced from Rogers's IOC that Rogers was reporting a violation of law. Rutledge acknowledged at trial that Burrell appeared to have violated the city code provision when he appeared on Clater's behalf before Judge Newman–Stanfield. Rutledge also noted in his written reprimand to Burrell that Burrell "appeared to be acting as a defense attorney for the arrested person by asking the judge if she could help the person." Rutledge testified, however, that he was not "really aware" of the city code provision before trial—although he admitted that, as the City Marshal, he was charged with the responsibility of upholding the City's ordinances.

Evidence of Rutledge's negative attitude towards Rogers's IOC includes Rogers's testimony that Rutledge asked him several times if he wanted to change the statements in his IOC. When Rogers responded that he did not, Rutledge reminded Rogers that Rogers was "a marshal and not one of them. The court people are their people; we are marshals." Rutledge also admitted that he had admonished Rogers that he was too strongly aligned with the judges and prosecutors, which "could create problems." According to Rogers, Rutledge's attitude during this exchange was very stern and serious. Not only is this evidence of Rutledge's negative attitude towards Rogers's report, it is also

evidence of Rutledge's negative attitude towards Rogers himself.

▆ The evidence also shows that Rutledge failed to adhere to his office's policy of progressive discipline. Rutledge explained that progressive discipline involved counseling sessions followed by an oral or verbal reprimand, a written reprimand, a suspension and/or probation, and then termination. In addition, deputies accused of wrongdoing were routinely given an opportunity to respond to the complaint or accusation. Rutledge admitted that he did not engage in any of these progressive discipline procedures over the customer-survey form incident. Instead, he immediately terminated Rogers's employment when Rogers admitted that the handwriting on the form was his. Rutledge explained that he took this drastic measure because of the devious, intentional nature of the offense. Rutledge did not, however, allow Rogers to take a polygraph test, despite Rogers's offer to do so, or otherwise give Rogers an opportunity to respond to the accusation.

▆ Finally, the timing of Rogers's termination is some evidence that the City's stated reason for Rogers's termination was false. *See Southland Life Ins. Co.*, 159 S.W.2d at 857–58 (holding that facts that give rise to rebuttable presumption are evidence to be considered by fact finder). Throughout his sixteen-month tenure with the City, Rogers had consistently received above-average employee evaluations and had been documented as being an excellent employee. Yet Rutledge terminated Rogers's employment just nineteen days after Rogers filed his IOC and one week after asking Rogers if he wanted to change his report. In addition, the record shows that, long before Rogers filed his IOC, the city marshal's office was aware of ongoing violations like the one Burrell committed. Sergeant Perez told Burrell to take Clater into Judge Newman–Stanfield's courtroom to see if she would accept Clater's mother's check, and Senior Deputy Warren testified that it was fairly common for a deputy to take a defendant into the courtroom and explain the defendant's situation to the judge. This is evidence that Rogers's discharge related more to his IOC, which he refused to change, than to his alleged falsification of the customer-survey form.

▆ There is no evidence of Rogers's discriminatory treatment in comparison to other similarly situated employees.[4] On various occasions, Perez was disciplined, but not terminated, for being rude to a subordinate deputy marshal, for openly criticizing his peers and other employees in front of Rutledge, for failing to control his emotions when dealing with employees, for neglect of duty in failing to ensure that a position was staffed, and for being disrespectful to Judge Newman–Stanfield. Perez received two verbal warnings and one written reprimand for engaging in this conduct. Likewise, Burrell received written warnings, but was not terminated, for representing a person in municipal court and for negligently backing into a police department vehicle while in a service station parking lot.

All of these punishments are significantly less drastic than termination and are at the lower end of the marshal's office's progressive scale of discipline; thus, this evidence shows that Rogers was disci-

---

4. We construe the trial court's finding regarding the City's discipline of Perez as a finding that Rogers received discriminatory treatment in comparison to similarly situated employees. The trial court also found that other employees besides Perez who had engaged in as or more egregious conduct than Rogers were not terminated, but the City does not specifically challenge this finding.

plined more swiftly and severely than Perez and Burrell. The three employees were not similarly situated, however, because Perez's and Burrell's wrongdoing did not involve intentional dishonesty designed to get another employee into trouble. Even without this factor, however, the evidence is legally and factually sufficient to establish that Rogers would not have been terminated had he not reported Burrell's illegal conduct in his IOC. *Zimlich*, 29 S.W.3d at 67; *Hinds*, 904 S.W.2d at 637. Accordingly, this evidence is also legally and factually sufficient to support the trial court's findings that Rutledge asked Rogers to change his IOC and was hostile to Rogers's good faith report, and that the City attempted to concoct other reasons for terminating Rogers. We overrule the City's third and fourth issues and sustain its fifth issue (challenging the disparate treatment finding).

### City's Affirmative Defense

It is an affirmative defense to a whistleblower suit that a public employer would have taken the adverse action against the employee based solely on information, observation, or evidence that is not related to the fact that the employee made a report protected under the Act. TEX. GOV'T CODE ANN. § 554.004(b). In its sixth issue, the City contends that it established its affirmative defense that Rutledge terminated Rogers for improperly completing a customer-survey form that disparaged another deputy marshal. The City also challenges the legal and factual sufficiency of the evidence to support the trial court's finding that it was unclear that Rogers had falsified the customer-survey form.

■■■ The City asserts that, if Rogers established a causal link between his IOC and his termination, then the burden of proof shifted to the City to rebut the alleged discrimination by showing a legitimate reason behind the discharge. *See Continental Coffee Prods. Co.*, 937 S.W.2d at 451 (applying burden-shifting standard articulated by court of appeals to workers' compensation retaliation claim because neither party had properly questioned the standard); *Hughes Tool Co. v. Richards*, 624 S.W.2d 598, 599 (Tex.Civ.App.-Houston [14th Dist.] 1981, writ ref'd n.r.e.) (same), *cert. denied*, 456 U.S. 991, 102 S.Ct. 2272, 73 L.Ed.2d 1286 (1982). *But see Hinds*, 904 S.W.2d at 637 (noting legislature's addition of affirmative defense provision to Whistleblower Act, but expressing no opinion about whether provision shifted the burden of proof). But the City did not request any findings of fact or conclusions of law with regard to its affirmative defense. A court of appeals cannot make findings of fact; it can only "unfind" facts. *Tex. Nat'l Bank v. Karnes*, 717 S.W.2d 901, 903 (Tex.1986). Thus, we cannot "find" that the City established its affirmative defense by showing that Rogers's termination was based solely on his alleged falsification of the customer-survey form.[5]

■■ Further, there is legally and factually sufficient evidence to support the trial court's finding that it was unclear that Rogers had falsified the customer-survey form. At the time he was terminated, Rogers admitted the handwriting on the form was his, but stated that he had not filled out the form and was being set up. He also offered to take a polygraph examination to prove his innocence, but Rut-

---

**5.** Rogers argues that the trial court rejected the City's affirmative defense by finding that the City "would not otherwise have terminated Rogers but for his making good faith re-

ports of violations of law." The City does not challenge this fact finding as it relates to the City's affirmative defense.

ledge said it was not necessary and handed Rogers his termination letter.

At trial, Rogers testified that he had written Bastek's name on a customer-survey form at Judge Newman–Stanfield's direction. According to Rogers, a woman came into the courtroom and complained that a deputy in another courtroom had been rude to her. Judge Newman–Stanfield had court personnel find out who the deputy was and, upon discovering that it was Bastek, told Rogers to write Bastek's name on the customer-survey form. Rogers wrote Bastek's name on the customer-survey form and handed it to the woman who was making the complaint. He testified that he did not know how the customer-survey form got into the complaint box. He further testified that he was so shocked at being terminated that he did not remember the incident at first and could not figure out what had happened.

Judge Newman–Stanfield testified that a female defendant in her courtroom complained to Rogers that a deputy from another courtroom had been rude to her. Judge Newman–Stanfield stated that she knew Bastek was the bailiff in the other courtroom, but she did not take action to find out whether he was the rude deputy, nor did she direct Rogers to write anyone's name on a customer-survey form. While Judge Newman–Stanfield's testimony contradicts Rogers's account somewhat, it does not contradict Rogers's statement that he merely wrote Bastek's name on the form for a customer rather than falsifying it on his own initiative.

Rutledge testified that he did not learn of Rogers's explanation for why he put Bastek's name on the customer-survey form until after Rogers filed his lawsuit. As fact finder, the trial court was free to believe Rogers's testimony that he did not falsify the customer-survey form, to resolve any inconsistencies between Rogers's and Judge Newman–Stanfield's testimony, and to disbelieve Rutledge's testimony that his sole reason for discharging Rogers was the alleged falsification. *McGalliard,* 722 S.W.2d at 697; *Akers v. Stevenson,* 54 S.W.3d 880, 884 (Tex.App.-Beaumont 2001, pet. denied); *Harvey v. Stanley,* 803 S.W.2d 721, 724 (Tex.App.-Fort Worth 1990, writ denied). We overrule the City's sixth issue.

## Mental Anguish Damages

██ The trial court awarded Rogers $50,000 in compensatory damages for "mental anguish, loss of enjoyment of life, and inconvenience" caused by the City's retaliation against him. In its seventh issue, the City asserts that the evidence is legally and factually insufficient to support the trial court's finding of damages for mental anguish.

 A mental anguish damages award cannot be supported absent direct evidence of the nature, duration, or severity of the anguish, thus establishing a substantial disruption in the plaintiff's daily routine, or other evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. *Saenz v. Fidelity & Guar. Ins. Underwriters,* 925 S.W.2d 607, 614 (Tex.1996); *Parkway Co. v. Woodruff,* 901 S.W.2d 434, 444 (Tex.1995). Using these standards, appellate courts must closely scrutinize mental anguish damages awards. *Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 54 (Tex.1997).

Here, the evidence shows that Rogers was "devastated" over being fired, became extremely depressed, and lost all motivation. In addition, his sleep pattern was completely disrupted: he stayed up all or most of the night and slept during the day. He also became extremely irritable, so

that his wife could not even have a conversation with him.

At the time of trial, Rogers had been taking sleeping pills, prescribed by his doctor, for about two years, and he was still losing sleep due to the termination. Before his discharge, Rogers had not had sleeping problems and had never been prescribed sleeping pills. Rogers's doctor also wanted to treat him for depression, but Rogers refused because he was afraid future employers would not hire him if he listed treatment for depression on an employment application. This evidence shows the duration of Rogers's mental anguish, establishes that his daily routine was substantially disrupted, and also shows that he suffered a high degree of mental pain and distress. *Saenz*, 925 S.W.2d at 614; *see also Robertson County v. Wymola*, 17 S.W.3d 334, 347 (Tex.App.-Austin 2000, pet. denied) (holding evidence legally and factually sufficient where plaintiff testified that, after she was fired, she felt like her whole world had completely fallen apart, she was terrified, she had no reason to go on and would have contemplated suicide but for her children, and the loss of her job was deep, devastating, and overwhelming).

■ Moreover, after his termination, Rogers had considerable difficulty obtaining a job in law enforcement. He applied at the police departments in Dallas, Everman, Keller, Haltom City, and Hurst, and at the Osteopathic Hospital. Although he made the final round of consideration in four of these jobs, he was never hired. The application process in Dallas went favorably for Rogers until the precinct checked his references. Eventually, Rogers obtained part-time employment as a bailiff in Tarrant County and worked as security for a bingo parlor. Rutledge also admitted that he knew when he discharged Rogers that it "probably wouldn't help"

Rogers's law enforcement career. Wrongdoing that threatens a person's reputation is sufficient to support an inference that the resulting injury was accompanied by mental anguish. *Parkway Co.*, 901 S.W.2d at 445.

We hold that the evidence is legally and factually sufficient to support the trial court's award of mental anguish damages. We overrule the City's seventh issue.

## Appropriate Law Enforcement Authority

■ In its post-submission brief, the City contends, for the first time, that Rogers's report of Burrell's activity was not made to an appropriate law enforcement authority. Ordinarily, an issue raised for the first time in a post-submission brief is not preserved for appellate review. *Romero v. State*, 927 S.W.2d 632, 634 n. 2 (Tex.1996). However, because we granted the City leave to file the post-submission brief, we will consider this issue. *See* Tex.R.App. P. 38.7 (providing that a brief may be supplemented whenever justice requires, on whatever reasonable terms the court may prescribe).

The Act defines an "appropriate law enforcement authority" as an authority that is a part of a state or local governmental entity that the employee in good faith believes is authorized to (1) regulate under or enforce the law alleged to be violated in the report; or (2) investigate or prosecute a violation of criminal law. Tex. Gov't Code Ann. § 554.002(b). The Texas Supreme Court has held that it is not enough that a governmental entity has *general* authority to regulate, enforce, investigate, or prosecute; the governmental entity must also be authorized to regulate under or enforce " '*the law alleged to be violated in the report,*' or to investigate or prosecute '*a violation of criminal law.*' " *Needham*, 82 S.W.3d at 319. Rutledge testified

that, as the City Marshal, he was charged with the responsibility of upholding city ordinances, and Fort Worth marshals also had authority to enforce city ordinances. Rutledge also admitted that it appeared that Burrell had violated a city ordinance. Because the city marshal's office was authorized to enforce the law alleged in Rogers's report to have been violated, Rogers made his report to an appropriate law enforcement authority.[6]

While it is true that the marshal's office investigated the Burrell incident and disciplined Burrell as part of its internal disciplinary process, it is no less true that Burrell violated a city ordinance—which the city marshal's office was authorized to enforce—by acting as defense counsel for Clater. The City directs us to Judge Newman–Stanfield's testimony that no law prohibited a judge from taking a check, rather than cash, from a defendant in payment of outstanding capias warrants.[7] The City's argument based on this testimony is beside the point. Irrespective of whether a judge was allowed to accept a check for outstanding capias warrants, it was unlawful for a deputy marshal such as Burrell to represent a defendant in municipal court. We overrule this issue.

### Conclusion

Because Rogers's report of Burrell's violation of law was protected by the Act and because the evidence supports the trial court's findings that Rogers was discharged because he in good faith reported a violation of law to an appropriate law enforcement authority, we reverse the trial

court's judgment and remand the cause to the trial court for entry of a judgment for Rogers consistent with the trial court's findings of fact and conclusions of law and with this opinion.

---

**6.** The *Needham* court also held that, even if an employee makes a report to the wrong entity, he is still protected under the Act if he in good faith believed the entity was an appropriate law enforcement authority. 82 S.W.3d at 320. In light of our holding that the City Marshal's Office was an appropriate law en-

forcement authority, we need not consider Rogers's good faith belief in this context.

**7.** Judge Newman–Stanfield's practice was that she would *not* accept a check in payment of outstanding capias warrants. She left that decision to the municipal clerk's office.